**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**AMY LEONHARTT,**

   *Plaintiff*,

  **v.**            **Case No. 1:23-CV-01211-JRR**

**MEDSTAR HEALTH, INC.,**

   *Defendant*.

<u>**MEMORANDUM OPINION**</u>

   Pending before the court are Defendant's Motion for Summary Judgment (ECF No. 48, the "Motion") and Plaintiff's Motion for Partial Summary Judgment (ECF No. 50). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2023).

**I.**  <u>**BACKGROUND**</u>

   Plaintiff Amy Leonhartt alleges her former employer, Defendant Medstar Health, Inc., discriminated against her by rejecting her requested religious exemption from its mandatory COVID-19 vaccination policy and terminating her employment for failure to comply with same. Except where noted, the following facts are undisputed.

  **A. Plaintiff's Employment History**

   On February 15, 2016, Plaintiff began working for Defendant as a pharmacist. (ECF No. 49, Leonhartt Deposition at Tr. 18:12–15; 20:5–10.) For the duration of her employment, Defendant maintained a mandatory influenza vaccine policy. *Id.* at Tr. 98:4–10. Plaintiff received and provided documentation of her annual influenza vaccination, and never sought a religious accommodation to avoid Defendant's mandate. *Id.* Plaintiff's supervisor described her as a "very good pharmacist," "detail-oriented," and "very by the book [for] safety." (ECF No. 50-4, Ashby Deposition at Tr. 16:9–11.) At the beginning of the COVID-19 pandemic, before the wide-spread

availability of vaccines, Plaintiff continued to work in-person and complied with masking and social-distancing requirements. (ECF No. 49, Leonhartt Dep. at Tr. 53:8–19.) Plaintiff worked in a "closed-door" facility where she had no interaction with patients or the public. *Id*. at Tr. 46:17–19; 47:5–7.

### B. Defendant's COVID-19 Vaccination Policy

On August 30, 2021, Kenneth Samet, Defendant's President and Chief Executive Officer, emailed all MedStar personnel that MedStar "associates, physicians, residents/fellows, students, Board members, medical staff members and other non-employed credentialed professionals, contractors, volunteers, agency employees, and vendors" were required to be fully vaccinated against COVID-19 by November 1, 2021. (ECF 48-9 at p. 1.) Under Defendant's policy, "fully vaccinated" was defined as "receiving both doses of a two-dose COVID-19 vaccine (Pfizer or Moderna) or the single-dose COVID-19 vaccine (Johnson & Johnson)." *Id.* In the August 30 email, Mr. Samet wrote "we will offer medical and religious exemptions." *Id.*

Defendant's official policy detailed the procedure for requesting a religious exemption from its COVID-19 vaccine policy. (ECF No. 48-10, MedStar Health Mandatory COVID-19 Vaccination Policy.) In pertinent part, the policy allowed exemptions for

> [a] sincerely held religious belief, practice or observance that prevents the individual from receiving any fully approved or approved under EUA COVID-19 vaccine, including Pfizer, Moderna, J&J/Jansen or any other vaccine FDA may authorize in the future. If you are granted an exemption, you will not be required to receive the COVID-19 vaccine, however you will be required to comply with alternative safety measures to be determined by the Executive Vice President and Chief Medical Officer based on community prevalence, which will include requirements for distancing, masking, and interval testing, among others to reduce the risk of COVID-19 transmission to you, our patients, visitors, and fellow Associates.
> …
> <u>Religious Exemption Request Process</u>

2

> When requesting a religious exemption request, you must fully complete and submit the religious exemptions section of the *COVID-19 Vaccination Request Form* regarding your sincerely held religious belief, practice or observance and how it prevents you from receiving any COVID-19 vaccine.

*Id.*

For MedStar employees who failed to submit written proof of receipt of the full COVID-19 vaccine or a completed COVID-19 Vaccination Exemption Form by the November 1 deadline, the policy specified:

> [a]ssociates (including, employed physicians and other credentialed individuals, employed residents and fellows) who fail to comply with this policy by the end of the designated COVID-19 Vaccination Period will be suspended without pay for at least one week, or the duration of time necessary to obtain Full Covid-19 Vaccination (number of days after final dose as defined by the FDA for vaccination status), after which they may comply and return to work. If an Associate (including, employed physicians and other credentialed individuals, employed residents and fellows) remains noncompliant at the end of the suspension period, the associate will be subject to discipline up to and including termination from employment. Residents who fail to comply with this policy may be subject to disciplinary action, up to and including dismissal, per GME policies as set forth in the MedStar Health House Staff Manual.
>
> Medical staff members and other credentialed professionals who fail to comply with this policy may have their privileges administratively suspended until they provide proof of compliance or until the end of the COVID-19 Vaccination requirement and may be subject to termination or nonrenewal of privileges for continued noncompliance.

(ECF No. 48-10, MedStar Health Mandatory COVID-19 Vaccination Policy at p. 6.)

Pursuant to its COVID-19 vaccine policy, Defendant developed an online religious exemption request form. (ECF No. 48-13 at p. 3.) The form was accessible by MedStar Health employees through Defendant's "myHR" portal. *Id.* The religious exemption request required associates

> to fill out some personally identifiable information, identify their
> sincerely held religious belief, practice, or observance; to explain
> how their sincerely held religious belief, practice, or observance
> applies in their daily life; an explanation how [sic] their religious
> belief, practice, or observance prevents them from complying with
> the Mandatory COVID-19 Vaccination Policy; and explain if such
> religious belief, practice, or observance applies to all vaccines or just
> the COVID-19 Vaccine; and an explanation as to why their religious
> beliefs apply to one vaccine but not others if applicable.

*Id.* Employees were allowed, but not required, to attach supporting documentation to their religious exemption requests. *Id.* After an employee submitted an exemption request, she received e-mail confirmation of submission and her request proceeded to the vaccination review team where a member of the team would conduct an individualized assessment of the request. *Id.* at p. 3–4.

### C. Plaintiff's Request for Accommodation

On September 7, 2021, Plaintiff submitted a religious exemption request. (ECF No. 48-4 at p. 2–6.) Plaintiff's request included a notarized affidavit of her "Religious Belief for Exemption from Mandatory COVID-19 Vaccination," a letter from her priest, Rev. Fr. Armando G. Alejandro, Jr., and two documents containing guidance from the Catholic Church: Congregation for the Doctrine of Faith's ("CDF") "Note on the Morality of Using Some Anti-COVID-19 Vaccines" and CDF's "Instruction Dignitas Personae on Certain Bioethical Questions." *Id.* In her affidavit, Plaintiff declared: "I, Amy Leonhartt, am a practicing Catholic, and my belief is sincere and meaningful." *Id.* at p. 4. She proceeded to lay out three "moral objections to a mandatory covid vaccine program." *Id.* Plaintiff's first objection concerns "the moral aspects of the use of the vaccines that have been developed from cell lines derived from tissues obtained from two fetuses that were not spontaneously aborted;" her second, the use of "gene therapy" in the vaccines; and her third, the potential of facing the same moral quandary repeatedly, given the likelihood of mandatory booster shots. *Id.* at pp. 4–5.

4

In response to her exemption request, on October 1, 2021, Defendant emailed Plaintiff requesting "full responses" to two follow up questions by October 6 "[i]n order to complete [Plaintiff's] application for religious exemption." (ECF No. 48-4 at p. 9–10.) The follow up email read as follows:

> 1. Describe how long you have held this belief you cannot use any product that has been tested for efficacy and safety on cells propagated from fetal cell lines.
> 2. Describe fully what other steps you have taken to observe this belief that you cannot use any product that has been tested for efficacy and safety on cells propagated from fetal cell lines.
>
> If you do not provide full responses, your request will be denied, and, in accordance with the MedStar Health Mandatory COVID-19 Vaccination Policy, you will be required to become fully vaccinated by the November 1, 2021 deadline to maintain employment with MedStar Health.

*Id.* at p. 10.

By email of October 6, 2021, Plaintiff answered: "I believe what I submitted on September 9, 2021, should be sufficient for a fair review of a religious exemption request. I am surprised that MedStar Health needs additional information, that stated I will answer your additional requests." (ECF No. 48-4 at p. 8.) In pertinent part, Plaintiff's response to Defendant's first follow-up question read:

> I am a strict supporter of life. I do not believe that abortion is morally acceptable. I have been a practicing Catholic since confirmation at youth. I have been a religious education instructor and confirmation teacher at my parish. I instruct the youth at my parish on the immortality of abortion. I do not wish to support abortion in any way. When the debate over covid vaccine initiated last year, I researched the topic thoroughly. I am aware that the vaccines are grown in or are tested using fetal cell lines. I am aware of this fact, and I object. Other products have not been hot topic issues like the current Covid-19 mRNA vaccines. To my best knowledge, other products have not been mandated for continued employment or societal participation. The mandatory nature of these new vaccine policies is an important distinction to consider.

> Vaccination by these specific Covid-19 mRNA products is not my individual choice.  The vaccine is **mandatory** by MedStar Health Policy.  As stated in my notarized affidavit of religious belief my first moral objection is the **mandatory** nature of MedStar Health's vaccine policy.  In line 5 from the Note on the Morality of Using Some Anti-Covid-19 vaccines, the CDF states, "…, practice reason make evident that vaccination is not, as a rule, a moral obligation and that, therefore, **vaccination must be voluntary**."  If I submit to your vaccine mandate, I will fail my moral conscience regarding supporting products that have been tested for efficacy and safety on cells from fetal cell lines.

*Id.* at p. 8–9.

> In response to the second follow-up question, Plaintiff wrote:

> Again, my objection is the **mandatory** nature of your vaccination policy.  I am unaware at this time of any other **mandatory** employment requirements that I have not already met.  If new **mandatory** health requirements arise that invoke my moral objection to using products that are tested using cells propagated from fetal cell lines, I will inform MedStar Health in the appropriate way.

*Id*. at p. 9.

Eight days after Plaintiff's October 6 email, Defendant resubmitted the same two follow-up questions by email to Plaintiff.  (ECF No. 48-4 at p. 12.)  On October 18, 2021, Plaintiff reiterated the same responses set forth in her October 6 email.  *Id*. at p. 11.

Defendant issued Plaintiff a final denial of her religious exemption request on October 20, 2021.  (ECF No. 48-4 at p. 16.)  Defendant stated that Plaintiff failed to sufficiently establish that her religious belief, practice or observance was sincerely held, and instructed Plaintiff that she must become fully vaccinated by November 1, 2021, in order to maintain employment with Defendant.  *Id*.  By letter of November 5, 2021, Defendant notified Plaintiff that she was suspended, without pay, effective November 7 for failure to comply with the COVID-19 Vaccination Policy and that she would be terminated from her position if she did not provide proof

of vaccination by November 14.  *Id.* at p. 13.  Finally, by letter of November 17, 2021, MedStar terminated Plaintiff from her position.  *Id.* at p. 14.  The letter informed Plaintiff that she had the right to contest the decision by filing a dispute with MedStar Health Human Resources Policy #203, Grievance and Dispute Resolution within 14 days.  *Id.*

### D.  Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging religious discrimination.  The EEOC issued a Notice of Right to Sue on February 28, 2023, and Plaintiff timely filed the instant action within 90 days of her receipt of the notice.  (ECF No. 1-1.)  On May 8, 2023, Plaintiff filed the instant Complaint alleging failure to accommodate and wrongful termination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606 ("MFEPA").  Defendant moved for summary judgment on all counts following the close of discovery.  (ECF Nos. 16, 48.)  In response, Plaintiff opposed the motion and cross-moved for partial summary judgment on liability.  (ECF No. 50.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## III.   ANALYSIS

As a threshold matter, Plaintiff brings each of her two claims under both Title VII and MFEPA. MFEPA is the state law analogue to federal employment discrimination statutes. *Ensor v. Jenkins*, No.CV ELH-20-1266, 2021 WL 1139760, at *18 (D. Md. Mar. 25, 2021). "Courts

judge discrimination and retaliation claims brought under MFEPA by the same standards as those same claims brought under Title VII." *Lowman v. Maryland Aviation Admin.*, No.CV JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019) (citing *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496–97 (D. Md. 2013)).  Accordingly, the court's below analysis of Plaintiff's claims under Title VII applies equally to her claims under MFEPA.  *See Ensor*, 2021 WL 1139760, at *18 (analyzing plaintiff's MFEPA claim under the Title VII standard); *see also Churchill v. Prince George's Cnty. Pub. Schs.*, No. PWG-17-980, 2017 WL 5970718, at *5 n.6 (D. Md. Dec. 1, 2017) (analyzing Title VII and MFEPA claims together).

Under Title VII, it is unlawful "for an employer . . . to discharge any individual . . . because of such individual's religion."  42 U.S.C. § 2000e-2.  The definition of "religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  "Because this definition includes a requirement that an employer 'accommodate' an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.  An employee can also bring suit based on the theory that the employer discriminated against her by failing to *accommodate* her religious conduct."  *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996) (emphasis in original).  Thus, courts generally recognize two theories for asserting religious discrimination claims: failure to accommodate and disparate treatment.  *Id.* at 1017; *see U.S. Equal Emp. Opportunity Comm'n v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 751 (D. Md. 2021) (same).

### A. Failure to Accommodate

Plaintiff alleges that Defendant wrongfully denied her a reasonable accommodation by refusing her requested religious exemption to its COVID-19 vaccination mandate. (ECF No. 1 ¶ 23.) An employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

"To state a prima facie failure-to-accommodate claim, an employee must allege that: '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 509 (D. Md. 2019) (quoting *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017)). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Firestone Fibers & Textiles Co.*, 515 F.3d at 312 (quoting *Chalmers*, 101 F.3d at 1019).

Here, the parties concur that Plaintiff informed Defendant of her religious belief that allegedly conflicted with the COVID-19 vaccine requirement and that she was fired from her position for failing to comply with the vaccine policy. The parties, through their cross motions, dispute whether Plaintiff's stated religious belief is bona fide. To demonstrate her religious belief is bona fide, Plaintiff must "show her professed belief is (1) sincerely held and (2) religious in nature." *Barnett v. Inova Health Care Servs.*, 125 F. 4th 465, 470 (4th Cir. 2025).

"The first prong, sincerity, 'seeks to determine an adherent's good faith in the expression of [her] religious belief' and 'provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Barnett*, 125 F. 4th at 470 (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). Courts in this circuit have found alleged religious beliefs to be sincere where "there is no evidence … that suggests that the beliefs have been concocted for litigation or are otherwise disingenuous." *Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548, 557 (E.D. Va. 2023); *Shigley v. Tydings & Rosenberg LLP*, 723 F. Supp. 3d 440, 446 (D. Md. 2024) (same).

The Fourth Circuit recently warned, "the inquiry into sincerity is 'almost exclusively a credibility assessment' and 'can rarely be determined on summary judgment, let alone a motion to dismiss.'" *Barnett*, 125 F. 4th at 470 (quoting *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)). Here, however, the record presents no genuine dispute of material fact as to the sincerity of Plaintiff's Catholic belief and anti-abortion convictions. In her affidavit attached to her exemption request, Plaintiff states she is "a practicing Catholic since confirmation as a youth," is "a strict supporter of life," "a religious education instructor and confirmation teacher at her parish" who "instruct[s] the youth of [her] parish on the immorality of abortion." (ECF No. 48-4 at p. 8.) In a letter attached to Plaintiff's exemption request, Plaintiff's Priest, Fr. Armando G. Alejandro, Jr., confirmed Plaintiff's good standing in the Church and that Plaintiff "holds sincere religious beliefs." *Id.* at p. 7. *See Davis v. Reliance Test & Tech., LLC*, No. CV DKC 22-1760, 2025 WL 266664, at *6 (D. Md. Jan. 22, 2025) (applying *Barnett* and finding that a plaintiff's assertion in his religious accommodation request that he is a "'baptized Catholic Christian,' and among other things, he must 'refuse the use of medical products including certain vaccines and gene therapy,

that are produced using human cell lines derived from direct abortions'" was sufficient evidence that his professed beliefs were sincerely held and religious in nature.).

Defendants introduce no evidence to suggest to the contrary, specifically, that Plaintiff's anti-abortion and Catholic beliefs are fraudulent, concocted for litigation, or otherwise not sincerely held. *See Ellison, supra; Shigley, supra; Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)) (noting "[w]e have said that summary dismissal on the sincerity prong is appropriate only in the 'very rare case[]' in which the plaintiff's beliefs are 'so bizarre, so clearly nonreligious in motivation that they are not entitled to First Amendment protection.'" (quoting *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1352–53 (10th Cir. 1998))).  Instead, Defendant insists Plaintiff's alleged religious beliefs are not bona fide because, at the second prong of the court's inquiry, she has not shown that her beliefs are religious in nature.  (ECF No. 48-1 at p. 20 ("the crux of this case boils down to 'whether Plaintiffs' beliefs fall on the religious or secular side of the line.'")).

The second prong, as to whether a claimant's sincerely held belief is religious in nature, "limit[s] the factfinder's inquiry to a determination whether 'the beliefs professed . . . are, in the claimant's own scheme of things, religious[.]'" *Barnett*, 125 F. 4th at 470 (quoting *Patrick*, 745 F.2d at 157–58).  In this determination, "the claim of the adherent 'that [her] belief is an essential part of a religious faith must be given great weight.'" *Id*. at 471.  Additionally, courts look to "whether the beliefs in question (1) 'address fundamental and ultimate questions having to do with deep and imponderable matters,' (2) are 'comprehensive in nature,' and (3) 'are accompanied by certain formal and external signs.'" *Ellison*, 692 F. Supp. 3d at 559 (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)).  Employees are not, however, "entitled to a blanket exemption entitling them to make 'unilateral decisions' about which job requirements to comply with, 'even where religion is expressly invoked in communicating the beliefs.'" *Shigley*

*v. Tydings & Rosenberg, LLP*, 723 F. Supp. 3d 440, 446 (D. Md. 2024) (quoting *Foshee v. AstraZeneca Pharms. LP*, 2023 WL 6845425, at *4 (D. Md. Oct. 17, 2023)).  "Ultimately, the question before the Court is whether the beliefs are based on a system that is recognizably a religious 'scheme of things,' rather than a secular morality or personal health, convenience, preference, or whim." *Id.* at 446–47 (quoting *Welsh v. United States*, 398 U.S. 333, 339 (1970)). Defendant argues that Plaintiff's three stated moral objections—to fetal cell lines in the vaccine's development, mRNA technologies, and booster-shot requirements—amount to a request for a prohibited blanket exemption and are not religious in nature.

In response to Defendant's follow-up question asking Plaintiff to "[d]escribe how long you have held this belief that you cannot use any product that has been tested for efficacy and safety on cells from fetal cell lines," Plaintiff wrote

> I am a strict supporter of life.  I do not believe that abortion is morally acceptable.  I have been a practicing Catholic since confirmation at youth.  I have been a religious education instructor and confirmation teacher at my parish.  I instruct the youth at my parish on the immortality of abortion.  I do not wish to support abortion in any way.  When the debate over covid vaccine initiated last year, I researched the topic thoroughly.  I am aware that the vaccines are grown in or are tested using fetal cell lines.  I am aware of this fact, and I object. . . .  If I submit to your vaccine mandate, I will fail my moral conscience regarding supporting products that have been tested for efficacy and safety on cells from fetal cell lines.

(ECF No. 48-4 at p. 8–9.)

Plaintiff's statement, in conjunction with her citation of her Church's guidance regarding the morality of receiving the COVID-19 vaccine, demonstrate the religious nature of her opposition to the vaccine mandate.  *See Davis*, 2025 WL 266664, at *6 (holding that a plaintiff's statement in his accommodation request that "he is a 'baptized Catholic Christian,'" and among other things, he must 'refuse the use of medical products including certain vaccines and gene

therapy, that are produced using human cells lines derived from direct abortions'" was "sufficient evidence that [plaintiff's] 'professed belief[s]' are … 'religious in nature.'"); *see also Dodson v. Lutheran Vill. at Millers Grant, Inc.*, No. CV EA-23-169, 2024 WL 3597201, at *4 (D. Md. July 30, 2024) (noting "courts in this District have found allegations of a religious objection to receiving the COVID-19 vaccine based on the use of aborted fetal tissue in the vaccine's development sufficient to state a prima facie claim); *Ellison*, 692 F. Supp. 3d at 559 (finding that the plaintiff sufficiently alleged a bona fide religious belief when he stated "he had a 'sincerely held religious belief in the sanctity of human life' and that—because he 'sincerely believe[d] that the use of these bodily remains renders these vaccines unclean,'—he could not comply with the policy."); *Foshee*, 2023 WL 6845425 at *5 (distinguishing plaintiff's non-religious exemption request from the religious-in-nature request in *Gardner-Alfred v. Fed. Rsrv. Bank of New York*, No. 22-CV-1585, 2023 WL 253580 (S.D.N.Y. Jan. 18, 2023), where plaintiff was a baptized Catholic who believed that it was her religious duty to refuse vaccines that were "created using human cell lines derived from abortion" and therefore sufficiently alleged a nexus "between [their] objection to immunization and their own religious beliefs.")

Where this court has rejected pro-life- or anti-abortion-based objections to vaccines as non-religious, the plaintiffs' allegations were devoid of the details Plaintiff here includes, specifically, what Plaintiff's religious beliefs are and how they connect to her opposition to the vaccine and to the vaccine policy. *See Shigley*, 723 F. Supp. 3d at 447 (holding plaintiff's allegations insufficient to state a claim for religious discrimination where "[p]laintiff does not state what religion, if any, she subscribes to. Without any explanation as to what [p]laintiff's religious beliefs are, or how her opposition to abortion is tied to religion, the Court is left with the bare allegation that the vaccine mandate violates her religious beliefs."); *Ellison*, 692 F. Supp. 3d at 560–61 (holding plaintiff

failed to explain how her opposition to a vaccine mandate was religious when her only relevant allegation was that she has religious objections to abortion, and to receiving vaccines.).  Here, Plaintiff supported the religious nature of her opposition to the vaccine and to Defendant's policy by specific citation to her Church's guidance.  (ECF No. 48-4 at p. 4–5.)  *See Ellison*, 692 F. Supp. 3d at 559 (find plaintiff adequately alleged "his subjective personal beliefs, how those beliefs are related to his faith, and how those beliefs form the basis of his objection to the COVID-19 vaccination" by referencing verses in the Christian bible to support his objection to the vaccine on fetal cell lines grounds.).

Defendant argues that "Plaintiff's objection to the COVID-19 Policy based on fetal cell lines appeared to be an afterthought rather than an objection based on religious beliefs" because Plaintiff repeatedly stated "her moral objection is voluntariness" and that Plaintiff failed to give Defendant sufficient information about her fetal cell lines objection.  (ECF No. 48-1 at p. 27–28.) Defendant insists Plaintiff's objection to the mandatory nature of MedStar's policy amounts to a claim to a God-given right to do whatever her conscience dictates and a "blanket privilege" that "could be used to evade any job requirement that [plaintiff] disagreed with."  *Foshee*, 2023 WL 6845425 at *5.  Unverifiable "blanket privileges" that, if given effect, would entitle an employee to evade job requirements generally are not statements of bona fide religious belief.  *Id.*  at *4–5.

The court disagrees that Plaintiff's exemption request amounts to a claim of a blanket privilege.  In her request, Plaintiff relied on the guidance from the Church to which she belongs regarding the religious quandary she perceived between her employer's vaccine policy and her personal opposition to the use of aborted fetal cells.  (ECF No. 48-4 at p. 4.)  The Catholic Church's guidance, as articulated in the CDF Note attached to Plaintiff's exemption request and her Priest's letter, is that "the choice to receive a COVID-19 vaccine is a matter of individual conscience."  *Id.*

at p. 7; ECF No. 50-6 at p. 5 ("when ethically irreproachable Covid-19 vaccines are not available
… it is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted
fetuses in their research and production process.").  The CDF clarifies further that "vaccination is
not, as a rule, a moral obligation and [] therefore, it must be voluntary."  (ECF No. 50-6 at p. 6.)
Additionally, the CDF instructs, "those who, however, for reasons of conscience, refuse vaccines
produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic
means and appropriate behavior, becoming vehicles for the transmission of the infectious agent."
*Id.*

Plaintiff invokes her Church's guidance in her religious exemption request; she emphasizes
the CDF's prohibition on mandatory vaccine policies, and describes how she will comply with the
CDF's instruction to engage in other, prophylactic means to reduce transmission of the virus.  (ECF
No. 48-4 at p. 4.)  The court notes, further, that Plaintiff did not object to Defendant's mandatory
influenza vaccination policy.  (ECF No. 49, Leonhartt Dep. at Tr. 98:4–10.)  Her objection,
therefore, to the COVID-19 vaccination policy is the mandatory requirement that she receive a
vaccine that was developed using fetal cell lines, not to any mandatory health policy.  (ECF No.
48-4 at p. 4, 9.)

Defendant additionally argues that Plaintiff failed to provide information regarding her
objection based on fetal cell lines sufficient to show a conflict with the vaccine mandate.  (ECF
No. 48-1 at p. 27–31.)  Defendant repeatedly states that Plaintiff failed to answer the follow-up
questions; but this assertion is not supported by the record.  *Compare* ECF No. 48-1 at p. 29
("Plaintiff failed to answer the [follow-up] questions.  Indeed she made no effort to discuss fetal
cell lines in her responses but only summarily stated that she objected to abortion.) *with* ECF No.
48-4 at p. 8–9 ("I am a strict supporter of life . . I have been a practicing Catholic since confirmation

as a youth . . . I do not wish to support abortion in any way . . . I am aware that the vaccines are grown in or are tested using fetal cell lines … and I object.").  Nor has Plaintiff failed to provide sufficient information to allow her employer the "opportunity to attempt reasonable accommodation." *Stroup v. Coordinating Ctr.*, 2023 WL 6308089, at *6 (D. Md. Sept. 28, 2023). Plaintiff detailed the prophylactic steps she was willing to take to prevent transmission of the disease. (ECF No. 48-4 at p. 4 ("I am willing to continue to mask and test for infection routinely.") MedStar's policy provided for similar steps for employees granted a religious exemption.  (ECF No. 48-10, MedStar Health Mandatory COVID-19 Vaccination Policy ("you will be required to comply with alternative safety measures . . . which will include requirements for distancing, masking, and interval testing, among others to reduce the risk of COVID-19 transmission")).

Considering the undisputed facts and the above-cited precedent, the court concludes there is no genuine dispute of material fact as to the religious nature of Plaintiff's stated opposition to the vaccine on the grounds that it was developed with fetal cell lines.  Plaintiff attests, and Defendants do not submit record evidence to dispute, that her personal belief and principle that it is immoral to support abortion in any way, including by receiving a COVID-19 vaccine, is rooted in, and a tenet of, her Catholic faith.  Accordingly, Plaintiff's objection to the vaccine based on fetal cell lines is a bona fide religious belief and Plaintiff states a prima facie failure-to-accommodate claim.

With regard to Plaintiff's second and third stated moral objections to the vaccine—mRNA technologies and booster shot requirements—Defendant argues that such beliefs are not religious in nature and do not conflict with its vaccine policy.  In her exemption request, Plaintiff "object[s] to the immortality of using novel mRNA as a vaccination tool," and explains that "[t]his novel approach is a form of genetic engineering.  If vaccinated, my body will create the COVID-19 spike

protein.  The introduced genetic instructions, created by man, takes the place of our God and Creator.  God did not intend my body to manufacture this protein."  *Id.*  Defendant rejected this objection because "only the Pfizer and the Moderna vaccines were developed with that technology.  And so, therefore, [Plaintiff] could've gotten the [Johnson & Johnson] vaccine."  (ECF No. 48-12, Kathryn Gorecki Deposition Tr. 15–18.)  Plaintiff does not address or dispute this contention.  *See Johnson v. United States*, 861 F. Supp. 2d 629, 634 (D. Md. 2012) (finding "[f]ailure to raise issues in opposition to summary judgment functions as a waiver." (citation omitted)); *Letke*, 2015 WL 6163517, at *1 n.2 (noting court may grant summary judgment in favor of defendant on grounds that plaintiff failed to identify any facts or portions of submitted documents that could create a dispute of material fact).

Similarly, it is undisputed that Defendant's policy, which required employees to be fully vaccinated against COVID-19, defined "fully vaccinated" as "receiving both doses of a two-dose COVID-19 vaccine (Pfizer or Moderna) or the single-dose COVID-19 vaccine (Johnson & Johnson)."  (ECF 48-9 at p. 1.)  Plaintiff's objection based on the potential need to receive booster shots was therefore not in conflict with her employer's policy, which included the Johnson & Johnson vaccine as a means of compliance.

In light of the court's finding that Plaintiff has stated a prima facie failure-to-accommodate claim, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship."  *Firestone Fibers & Textiles Co.*, 515 F.3d at 312 (quoting *Chalmers*, 101 F.3d at 1019).  "Whether an undue hardship exists is usually considered an issue of fact to be determined on summary judgment."  *Dean v. Acts Ret. Life Communities*, No. 23-cv-1221-GLR, 2024 WL 964218, at *6 (D.Md. Mar. 6, 2024) (citing *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)).  "This is a two-prong inquiry.  To satisfy its burden, the

employer must demonstrate *either* (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have 'result[ed] in more than a *de minimis* cost to the employer.'" *Firestone Fibers & Textiles Co.*, 515 F.3d at 312 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986)) (emphasis original).

By its policy, Defendant allowed employees who received religious exemptions to comply with alternative safety measures.  (ECF No. 48-10, MedStar Health Mandatory COVID-19 Vaccination Policy at p. 3–4.)  In her exemption request, Plaintiff expressly indicated her willingness to comply with such alternative safety measures.  (ECF No. 48-4 at p. 4.)  But Defendant declined to provide Plaintiff with her requested accommodation (ECF No. 48-4 at p. 16) and submits no evidence to suggest that providing such accommodation would have posed an undue hardship; indeed, Defendant does not address the feasibility of accommodating Plaintiff. *See Johnson*, 861 F. Supp. 2d at 634 (finding "[f]ailure to raise issues in opposition to summary judgment functions as a waiver").  Specifically, Defendant makes no argument that providing Plaintiff with a religious exemption and allowing her to employ alternative safety measures would result in "substantial increased cost in relation to the conduct of its particular business." *Davis v. Reliance Test & Tech., LLC*, Civ. Case No. 22-1760 DKC, 2025 WL 266664, at *7 (Jan. 22, 2025) (quoting *Groff v. DeJoy*, 600 U.S. 447, 464 (2023) (finding that defendant demonstrated that accommodation of plaintiffs' vaccination exemptions was an undue hardship because it risked defendant's contract with the government and plaintiffs were unable to perform their jobs fully while unvaccinated)).

Accordingly, based on the undisputed facts and applicable law, Plaintiff has demonstrated that Defendant discriminated against her based on her religion by failing to accommodate her religious exemption request.

### B. Wrongful Termination

Plaintiff alleges that "[b]y firing Ms. Leonhartt explicitly because she refused to submit to Covid vaccinations that could not be reconciled with her sincerely held and thoroughly demonstrate religious convictions, MedStar discriminated against Ms. Leonhartt on the basis of her religion." (ECF No. 1 ¶ 25.) "To prove a Title VII claim under a disparate treatment theory, a plaintiff 'must demonstrate that the employer treated her differently than other employees because of her religious *beliefs*.'" *Barnett*, 125 F. 4th at 471 (emphasis original) (quoting *Chalmers*, 101 F.3d at 1012). "Accordingly, a plaintiff-employee, alleging disparate treatment with respect to her discharge, satisfies her burden at the summary judgment stage if she establishes that her job performance was satisfactory and provides 'direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the] discharge was discriminatory.'" *Chalmers*, 101 F.3d at 1017 (quoting *Lawrence v. Mars, Inc.*, 955 F.2d 902, 905–06 (4th Cir.), *cert. denied*, 506 U.S. 823 (1992)).

In her Motion for Partial Summary Judgment, Plaintiff does not point to any statement by Defendant that reflects or suggests a desire or intent to treat her differently due to her religion and which bore on the termination decision. *See Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003) (explaining direct evidence of discrimination as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."). Plaintiff admits she was fired for violating the vaccination policy that

applied equally to all employees, regardless of religion.  (ECF No. 49, Leonhartt Deposition Tr. 75:15–18; 50:8–18.)

Without direct evidence, Plaintiff's remaining option to establish a prima facie case of religious discrimination is under a burden-shifting scheme similar to the one articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> This might consist of evidence that the employer treated the employee more harshly than other employees of a different religion, or no religion, who had engaged in similar conduct.  If the employee presents such evidence, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions towards the employee.  The employee is then required to show that the employer's proffered reason is pretextual, and that the employer's conduct towards her was actually motivated by illegal considerations. At all times, the ultimate burden of persuasion lies with the employee.

*Chalmers*, 101 F.3d at 1017–18 (citations omitted).

It is undisputed that Defendant's vaccination policy applied equally to all employees.  (ECF No. 49, Leonhartt Deposition Tr. 50:8–18; ECF No. 48-10, MedStar Health Mandatory COVID-19 Vaccination Policy at p. 2.)  Plaintiff introduces no evidence to suggest, or on which a reasonable conclusion could be based, that other employees engaged in similar conduct—namely, refused to be vaccinated in violation of the policy—and were not fired or were treated less harshly. *See Barnett*, 125 F.4th at 472 (finding plaintiff had "sufficiently alleged facts supporting a reasonable inference of discriminatory intent" when plaintiff alleged defendant-employer "decided to pick winners and losers from among the employees making exemption requests, based upon whether the [Exemption Committee] found an employee's religious beliefs were legitimate" and "chose to exempt employees who came from more prominent religions or held to more conventional beliefs related to religious exemption to vaccines, but denied exemptions to employees [] who held less well-known or respected religious beliefs").  The court notes, finally,

21

that Plaintiff does not respond to Defendant's argument that she failed to establish a disparate-treatment religious discrimination claim; instead, Plaintiff's cross-motion for summary judgment focuses on arguments related to her religious accommodation claim.  *See Johnson*, 861 F. Supp. 2d at 634 (finding "[f]ailure to raise issues in opposition to summary judgment functions as a waiver.").  Accordingly, Plaintiff fails to generate a triable issue as to her disparate-treatment religious discrimination claim and Defendant is entitled to judgment on same.

IV.    **CONCLUSION**

For the reasons set forth herein, by separate order, Defendant's Motion (ECF No. 48) will be granted in part and denied in part, and Plaintiff's Motion for Partial Summary Judgment (ECF No. 50) will be granted in part and denied in part.

March 7, 2025

/S/

_____
Julie R. Rubin
United States District Judge